**Maude KELLY et al., Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF the INTERIOR et al., Defendants.**

**Civ. No. S–1098.**

United States District Court,
E. D. California.

Feb. 22, 1972.

---

George F. Duke, Lee J. Sclar, William P. Lamb, California Indian Legal Services, Berkeley, Cal., for plaintiffs Kelly, Heffington and Higgins.

Gard Chisholm, Jackson, Cal., for plaintiffs Cooper and Kilgore.

Dwayne Keyes, U. S. Atty., Richard H. Jenkins, Asst. U. S. Atty., Sacramento, Cal., for defendant.

Before JERTBERG, Circuit Judge, and MacBRIDE and CROCKER, District Judges.

## MEMORANDUM AND ORDER

MacBRIDE, District Judge.

This is an action for an injunction to prohibit a proposed distribution of property under the Rancheria Act (P.L. 85–671 as amended by P.L. 88–419) and for a judgment declaring the plaintiffs' right to participate in the distribution. Originally enacted in 1958 and amended in 1964, the Rancheria Act authorizes the Secretary of the Interior to divide and distribute the assets of California Indian rancherias and reservations after the vote of a majority of the members of each reservation. Since the action seeks an injunction against the enforcement of an allegedly unconstitutional federal statute, 28 U.S.C. § 2282 required this three-judge court to be convened.

Under the Rancheria Act and its implementing regulations, the Secretary of the Interior prepared a list of the Indians of the Jackson Rancheria who were eligible to vote for a distribution of assets and later approved a plan containing a list of designated recipients. *See* 25 C.F.R. §§ 242.3 and 242.4. Excluded from both lists, plaintiffs protested without success at various stages of the administrative process. Although none of the plaintiffs actually reside on the Jackson Rancheria, they claim a right to share in the assets largely through Sally

Yellowjacket, a common ancestor in the Mewak tribe who lived on the rancheria near the turn of the century.[1] Having exhausted their administrative remedies, they brought this action for judicial relief on eight separate grounds. We granted a preliminary injunction to halt the proposed distribution pending a hearing on the merits.

Plaintiffs have now moved for summary judgment, resting on only three of the eight asserted grounds of relief. Their main argument—and the one which required the convening of a three-judge court—is that the Rancheria Act delegates congressional authority to the Secretary of the Interior without an adequate standard, thus violating the Separation of Powers doctrine of the Constitution. They also attack the Rancheria Act regulations, first on the ground that the Secretary's cancellation of a rule under which they would have qualified for a distribution was arbitrary and capricious, and second, on the ground that the 1965 regulations were illegally issued. Disputing all three contentions, the United States has filed a cross-motion for partial summary judgment.

## DELEGATION OF CONGRESSIONAL AUTHORITY

■ Relying on the principle that Congress may not delegate its legislative powers to administrative agencies without a standard to guide them, plaintiffs contend that the Secretary's authority to distribute property to "Indians of a rancheria or reservation" is unconstitutional because it provides no basis for discriminating between persons who do and do not qualify for the property. In support of their position, they cite the only two cases in American legal history which have found unlawful congressional delegations to administrative agencies,[2]

Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570 (1935). In the first decision, the Supreme Court struck down the President's authority to prohibit interstate shipments of oil, finding that Congress had declared "no policy . . . no standard . . . no rule" for determining when and under what conditions to outlaw the shipments. The President's power to adopt "codes of fair competition" recommended by trades and industries met a similar fate in Schechter Poultry Corp. v. United States, *supra*, where the Court found that the act contained "no" standards and conferred "unfettered" discretion. In both cases, a violation of the President's orders was a crime.

The potentially broad applications of *Panama* and *Schechter*, by now the standard citations for those who attack Congressional delegations, never blossomed. In Fahey v. Mallonee, 332 U.S. 245 at 249, 67 S.Ct. 1552 at 91 L.Ed. 2030 at 2036 (1947), the Supreme Court itself narrowly construed the decisions:

> Both cited cases dealt with delegations of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom. The latter case [Schechter v. U. S.] also involved delegations to private groups as well as to public authorities.

Other opinions of the Court have upheld congressional delegations of nearly boundless authority. Thus, the Court has given its approval to statutes granting administrators the power to ensure that certain businesses do not " 'unduly or unnecessarily complicate the [corporate] structure,' or 'unfairly or inequitably distribute voting power;' "[3] to re-

1. Of the five plaintiffs, apparently only Maude Kelly has actually resided on the Jackson Rancheria. Her affidavit shows that she lived on the reservation with her grandmother, Sally Yellowjacket, off and on during her school days shortly after the turn of the century.

2. *See* 1 Davis, Administrative Law Treatise § 2.01 (1958).

3. American Power & Light Co. v. S. E. C., 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946).

cover "excessive profits;" [4] to fix prices of goods which "in his [the administrator's] judgment will be generally fair and equitable;" [5] to appoint conservators to take over the business of savings and loan associations; [6] and to perform numerous other functions—all without defining the administrator's sphere of authority.[7]

■ Whatever utility the doctrine forbidding unbounded delegations may now have, we feel that the Rancheria Act easily escapes censure. Its first redeeming feature is its plain purpose to establish a flexible program. Noting the difficulty of precisely defining the classes of Indians to benefit under the Rancheria Act, Congress deliberately left the choice to the Secretary,[8] thus following a long custom of endowing the Secretary of the Interior with broad authority over Indian affairs. See Board of Com'rs of Pawnee County v. United States, 139 F.2d 248 at 251–252 (10th Cir. 1943). While it perhaps could have more clearly delineated the qualifying classes of Indians, it wisely chose to avoid the inequities latent in rigid classifications. In circumstances where Congress acknowledges an administrator's superior ability to implement its programs, the power to delegate should be—and is—especially broad. As the Supreme Court has remarked,

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. Lichter v. United States, 334 U.S. 742 at 785, 68 S.Ct. 1294 at 1316, 92 L.Ed. 1694 at 1726 (1948); see also Currin v. Wallace, 306 U.S. 1 at 15, 59 S.Ct. 379, 83 L.Ed. 441 at 451 (1939).

■ Although somewhat broadly drafted to achieve flexibility, the Rancheria Act is sufficiently explicit to preserve a crucial safeguard, the right of meaningful judicial review.[9] Balancing Congress frequent need to rely upon the wisdom of administrators to implement its programs effectively with the public's right to demand government by laws and not by men, the Supreme Court has developed a sensible test for evaluating the limits of Congress' power to delegate:

Only if we could say that there is an *absence* of standards for the guidance of the Administrator's actions, so that it would be *impossible* in a proper [judicial] proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose . . .

4. Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1094 (1948).

5. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

6. Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

7. For other cases upholding congressional delegations with only the barest of guidelines, see 1 Davis, Administrative Law Treatise §§ 2.03 and 2.04 (1958) and 1970 Supp. § 2.04.

8. A Senate Report discussing the Rancheria Act is revealing:
"Attention is directed to the fact that no provision is made for preparing a membership roll for each rancheria or reservation. The preparation of such rolls would be impracticable because the groups are not well defined. Moreover,

the lands were for the most part acquired and set aside by the United States for Indians in California, generally, rather than for a specific group of Indians and the consistent practice has been to select by administrative action the individual Indians who may use the land. The bill provides for the distribution of the land, or the proceeds from the balance of the land, primarily on the basis of plans prepared or approved by those administratively selected users of the land." Senate Report 1874, page 3, 85th Congress, 2d Session, 1958.

9. Although § 10(a) of the Rancheria Act appears to make the Secretary's decisions final, we have construed it in a previous opinion to permit judicial review. *See* the Court's Memorandum and Order of February 5, 1970.

(Emphasis ours.) Yakus v. United States, 321 U.S. 414 at 426, 64 S.Ct. 660 at 668, 88 L.Ed. 834 at 849 (1944).[10] As we read it, the test requires only that the Act provide enough guidance to permit us to determine whether the Secretary's decisions fall somewhere within broad congressional objectives, a task for which we feel adequately equipped.

■ Viewed in context, the phrase "Indians of a rancheria" is not as obtuse as it may seem. To begin with, the word "of" has a rather accepted judicial construction; it generally means " 'associated with' or 'connected with' or 'pertaining to.' " California Rice Industry v. Federal Trade Commission, 102 F.2d 716 at 721 (9th Cir. 1939); see also Harlan v. Industrial Accident Commission, 194 Cal. 352 at 361, 228 P. 654 (1924). This construction finds support in Congressional history, which reveals that the Act was intended to benefit "users" of the property.[11] Furthermore, § 5(d) of the Act, which authorizes the Secretary to sell rather than distribute *unoccupied* reservations, confirms what we feel to be obvious—that Congress intended to benefit Indians who have roots on the reservation property. Although far from precise, this standard achieves Congress' objective to establish flexibility and yet permits us to determine if the Secretary has wandered too far afield. We therefore think it is amply sufficient to remove any doubt about the constitutionality of the delegation.

## CHANGE IN REGULATIONS

Plaintiffs next contend that the Secretary unlawfully change the administrative regulations which define the qualifying classes of Indians. In 1965, a year after Congress had amended the Rancheria Act, the Secretary deleted a section of the regulations under which Indians claiming a "special relationship" to the reservation could qualify for a share of the assets. Alleging that they qualify under this provision but not under the amended regulations, plaintiffs urge us to declare that the change resulting in their exclusion from the program was arbitrary and capricious. While their complaint broadly alleges that the amended regulations themselves are unreasonable and invidiously discriminatory, they have attacked at this stage of the suit only the *act of changing* the regulations. The argument thus limited, we have no problem rejecting it.

■ No rule of law forbids an agency from changing its regulations. City of Chicago v. Federal Power Commission, 128 U.S.App.D.C. 107, 385 F.2d 629 at 637 (1967); see also Greater Boston Television Corp. v. Federal Communications Commission, 143 U.S.App. D.C. 383, 444 F.2d 841 at 852 (1971) and New Castle County Airport Commission v. Civil Aeronautics Board, 125 U.S.App.D.C. 268, 371 F.2d 733 at 735 (1966). Sound policy reasons, indeed, underscore the need for broad authority to revise them. Administrators need room to freshen stale policies, adjust their rules to reflect actual experiences, and even reverse their thinking if necessary to promote Congress' programs effectively. This is not to say, of course, that administrators have *carte blanche* to wield their office arbitrarily. We only say that a change in the regulations resulting in an alleged loss of benefits does not in itself show that the Secretary has acted arbitrarily. We therefore reject the argument that the change in the regulations was itself illegal.

## UNLAWFUL PROMULGATION OF REGULATIONS

The plaintiffs' final assault, that the amended regulations were illegally issued, finds its mark. Under 5 U.S.C. § 553(b), the terms or substance of a pro-

---

10. *See* also American Power & Light Co. v. S. E. C., 329 U.S. 90 at 105, 67 S.Ct. 133, 91 L.Ed. 103 at 116 (1946); and Alaska Steamship Co. v. Mullaney, 180 F.2d 805 at 821–822, 12 Alaska 594 (9th Cir. 1950).

11. See the Senate Report excerpted in footnote 8, *supra*.

posed administrative regulation must be published in the Federal Register at least 30 days before its effective date, unless "good cause" excuses the requirement. Admitting his failure to comply with this 30-day rule, the Secretary invokes the "good cause" exception on the ground that an immediate effective date was necessary.

 We begin our analysis by reaffirming the fundamental principle that administrative regulations are void unless published in strict conformity with the Administrative Procedure Act. Hotch v. United States, 212 F.2d 280 at 283–284, 14 Alaska 594 (9th Cir. 1954). Since we do not agree with the Secretary that he properly ignored the 30-day rule, we must therefore set aside the amended regulations.

 An agency availing itself of the "good cause" exception must first determine that compliance with the 30-day requirement is either impracticable, unnecessary, or contrary to the public interest, and it then must preface the new regulations with a "finding and a brief statement of the reasons therefor." 5 U.S.C. § 553(b) (B). The explanation accompanying the amended regulations in this case, we think, is noticeably deficient. It provides only that

> Notice of proposed rule-making procedure is being waived since the amended regulations are necessitated by and in conformity with federal statute, and it is desirable that there be no further delay in the beneficial effect of the Act of August 18, 1958, *supra,* as amended. Therefore, the amended regulations will become effective on the date of publication in the FEDERAL REGISTER.

While this notice contains an implicit "finding" that further delay would have prejudiced the Act's beneficiaries, it mentions no supporting "reasons." The Secretary argues that over a year had already elapsed between the time Congress had amended the Act and he had changed his regulations, but neither he nor the notice explains why an additional 30 days was critical. Dighton v. Coffman, 178 F.Supp. 114 (E.D.Ill. 1959), aff'd 279 F.2d 497 (7th Cir. 1960). We think the omission is fatal not only because it violates § 553(b) (B), but also because it leaves us with nothing to measure the propriety of ignoring the 30-day rule.

 Pressing further, the Secretary asks us to uphold publication of the regulations on a somewhat novel theory, which we reject. He argues that the publication of the regulations in the Federal Register "should be viewed as notice that the regulations so published would become effective within 30 days unless comment, data or arguments convinced the Secretary of the Interior that the regulations should be modified or withdrawn"—even though the regulations were quite clearly effective immediately! Since plaintiffs did not object to the regulations until approximately four months after the fictional 30-day comment period had expired, he concludes that they cannot now complain, citing Borg-Johnson Electronics v. Christenberry, 169 F.Supp. 746 at 752 (S.D.N.Y.1959).

The weaknesses of the Secretary's argument are apparent. First, permitting this strange procedure would thwart the clear purpose of the 30-day rule, to afford interested persons an opportunity for airing their views *before* the regulation is officially adopted. See Pacific Coast European Conference v. United States, 350 F.2d 197 at 205 (9th Cir. 1965). We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a *fait accompli.* Upholding regulations which we think were defectively issued, furthermore, emasculates the Administrative Procedure Act. As the Court of Appeals for the Ninth Circuit has said,

**1102**

"If notice of a proposed rule is not published in the Federal Register at least thirty days prior to its issuance, or if good cause is not found *and published* for the immediate issuance of a rule, the rule cannot be legally issued." (Emphasis ours.) Hotch v. United States, supra, 212 F.2d at 284. We therefore find the amended regulations to have been illegally issued.

■ Voiding the present regulations on what at first blush appears to be a technicality is not as pointless as it may seem. We believe that the 30-day notice rule serves an important interest, the right of the people to present their views to the government agencies which increasingly permeate their lives. The interchange of ideas between the government and its citizenry provides a broader base for intelligent decision-making and promotes greater responsiveness to the needs of the people, especially in cases such as this where Congress has only roughed in its program. Indeed, a meaningful pre-publication dialogue between plaintiffs and the Secretary may have even avoided this lawsuit. In our opinion, therefore, the 30-day comment period should be closely guarded and the "good cause" exception sparingly used. See Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3rd Cir. 1969).

To recap, we have concluded that the Rancheria Act is not an unconstitutional delegation of Congressional authority and that the Secretary's change in the regulations was not in itself arbitrary. To this extent, therefore, the government's cross-motion for summary judgment is granted. We have also decided that the Secretary's latest regulations were illegally published and on this limited issue, therefore, we grant plaintiffs' motion for summary judgment. Since the re-publication of the regulations could conceivably moot plaintiffs' remaining contentions, we stay further proceedings in this action until after publication of the new regulations.