**COMMONWEALTH OF PENNSYL-
VANIA et al., Plaintiffs,**

v.

**UNITED STATES of America and Inter-
state Commerce Commission,
Defendants.**

Civ. A. No. 72–63.

United States District Court,
M. D. Pennsylvania.

June 4, 1973.

As Amended on Denial of Rehearing
June 25, 1973.

Thomas E. Kauper, Asst. Atty. Gen., S. John Cottone, U. S. Atty., Scranton, Pa., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for the United States.

Fritz R. Kahn, Gen. Counsel, Seymour Glanzer, Atty., Washington, D. C., for the Interstate Commerce Commission.

J. Shane Creamer, Atty. Gen., Harrisburg, Pa., Gordon P. MacDougall, Spec. Asst. Atty. Gen., Washington, D. C., Philip P. Kalodner, Counsel, Edward Munce, Asst. Counsel, Alfred N. Lowenstein, Asst. Counsel, Pennsylvania Public Utility Comm., Harrisburg, Pa., for Commonwealth of Pennsylvania and Pennsylvania Public Utility Comm.

William G. Mahoney, Washington, D. C., for Congress of Railway Unions.

Before ROSENN, Circuit Judge, SHERIDAN, Chief Judge and NEALON, District Judge.

## OPINION

ROSENN, Circuit Judge.

This proceeding raises important issues relating to the authority of the Interstate Commerce Commission (I.C.C.)

to adopt new procedures to accelerate proceedings and expedite the disposition of rapidly escalating numbers of railroad applications for abandonment of lines. This action by a number of state agencies and labor unions seeks to enjoin, suspend and set aside new rules of the Commission because they allegedly exceed its authority and were promulgated in violation of the Administrative Procedure Act (A.P.A.). We hold that the procedures established are within the statutory authority of the Commission and were promulgated in compliance with the A.P.A. We, therefore, dismiss this action.

## I. THE PROCEEDINGS

Prior to the establishment of the new rules governing abandonment petitions, the I.C.C. had one standard procedure, called the "long form", for handling such requests. 49 C.F.R. §§ 1121.1–1121.5. Although this procedure, adopted in 1971, was simpler than the 1941 procedures it replaced, the I.C.C. believed further simplifications and expedition of abandonment petitions were needed to cope with the current railroad crises in the northeast quadrant of the country.

The rules challenged here establish two additional "short form" abandonment procedures. Under Subpart B of the new rules, the agency establishes a rebuttable presumption that abandonment should be permitted for any railroad showing fewer than 34 carloads per mile were carried over the lines for which abandonment is sought during the year preceding the petition. 49 C.F.R. §§ 1121.20–1121.24. Subpart C provides for filing of a short form application where no public objection is anticipated

by the railroad. 49 C.F.R. §§ 1121.30–1121.35.[1]

The I.C.C. issued the new rules governing the filing and handling of such proceedings on January 14, 1972. Abandonment of Railroad Lines, Ex Parte No. 274 (Sub.-No. 1). The new rules were to become effective upon publication in the Federal Register on January 22, 1972. 37 F.R. 1046. After receiving objections to the new rules, the I.C.C., on February 10, 1972, announced that no decision would be made on the merits of any abandonment proceeding under the new rules until it had ruled on the petitions for reconsideration which it had stated it would entertain on February 4, 1972.

The Commonwealth of Pennsylvania and Pennsylvania Public Utility Commission (hereinafter "Pennsylvania") and Congress of Railway Unions instituted this action against the I.C.C. in the United States District Court for the Middle District of Pennsylvania on February 10, 1972, seeking to restrain operation of the new rules until a three-judge court could review their legality.[2] On February 16, 1972, operation of the new I.C.C. rules was restrained by Judge Michael H. Sheridan pending hearing of the request that a three-judge court permanently enjoin their operation, or final disposition of rehearing petitions by the I.C.C., whichever should occur sooner. This three-judge panel was constituted pursuant to 28 U.S.C. § 2284 to hear the action.

After receiving and considering 26 petitions for reconsideration, the I.C.C., with slight changes in the rules, denied the petitions and through publication in the Federal Register on September 16,

---

1. The existing "long form" procedures were redesignated Subpart A.

2. Since institution of the action, applications for leave to intervene as plaintiffs have been granted to the New York State Department of Transportation, Iowa State Commerce Commission, Illinois Commerce Commission, State Corporation Commission of Kansas, Nebraska State Railway Commission Cooperative Legislative Committee—Railroad Brotherhoods in Pennsylvania, and Pennsylvania State Legislative Board (United Transportation Union). Applications for leave to intervene as defendants have been granted to the Association of American Railroads, Penn Central Transportation Company and Erie Lackawanna Railway Company.

1972, announced the new rules would go into effect. 37 F.R. 181, p. 18918. Although denial by the I.C.C. of the rehearing petitions ended the effect of the temporary restraining order, by stipulation of the parties, the new rules have not been put into operation pending the final decision of this court.

Plaintiffs challenge the new I.C.C. rules on two major grounds: (1) the rules alter the substantive law of railroad abandonment as expressed in 49 U.S.C. § 1(18)–(20), and therefore exceed the authority of the I.C.C.; and (2) administrative procedures required for promulgation of the rules by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553, were not complied with since no public hearing was held, a statement of the basis and purpose of the rules was not presented, and in addition, the rule's departure from prior norms and the legal basis for that departure were not explicated. The I.C.C. contends the rule was within its statutory authority and that all necessary administrative procedures were fulfilled.

## II. NATURE OF THE RULES

Consideration of both statutory authority for promulgation of the new rules and procedural means by which they were adopted requires careful scrutiny of their effect on railroad abandonment proceedings. The I.C.C. is granted authority to permit abandonments by 49 U.S.C. § 1(18)–(20). Subsection (18) prohibits abandonment of any railroad line subject to I.C.C. jurisdiction "unless and until there shall first have been obtained from the Commission a certificate that the present and future public convenience and necessity permit of such abandonment." Subsection (20) gives the Commission power to issue such a certificate, to refuse to issue it, or to issue it for portions of a railroad line. Subsection (19), primarily at issue here, grants the Commission authority to establish "rules and regulations as to hearings and other matters" in connection with consideration of applications for abandonment certificates. No-

tice to the governor of the State in which the lines to be abandoned run is required, and he has the "right to be heard as hereinafter provided with respect to the hearing of complaints."

The statute itself does not define "the present and future public convenience and necessity" which must be found by the I.C.C. before granting an abandonment petition. The general test for determining whether an abandonment certificate should be granted, however, was set down almost 50 years ago in Colorado v. United States, 271 U.S. 153, 46 S. Ct. 452, 70 L.Ed. 878 (1926):

> The benefit to one [traffic on lines other than the one to be abandoned] of the abandonment must be weighed against the inconvenience and loss to which the other [traffic which had previously moved on the line to be abandoned] will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce. . . . The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate.

271 U.S. at 168, 46 S.Ct. at 456. The Court recognized that if a railroad were required to continue to operate non-prosperous lines, its ability to provide necessary services on more prosperous lines could be damaged. It would therefore be in the best interests of the public to allow abandonment of the nonprosperous lines in order to maintain more necessary services on other lines. Nonetheless, the Court recognized a railroad line, which imposed "a relatively light burden upon a prosperous carrier," should not be abandoned if "the communities directly affected" would be subjected to "serious injury." 271 U.S. at 169, 46 S.Ct. at 456. Therefore, said the court:

> Whatever the precise nature of these conflicting needs, the determination is made upon a balancing of the respec-

tive interests—the effort being to decide what fairness to all concerned demands.

271 U.S. at 169, 46 S.Ct. at 456. Because the determination to be made by the I.C.C. involves a balancing of interests, the Court noted that no specific findings of fact were necessary. 271 U.S. at 169, 46 S.Ct. 452.

The Commission has consistently followed the weighing of interests test since *Colorado*. It recently reiterated this test in Anapee & Western Ry. Co. Abandonment, Etc., 336 I.C.C. 395, 413 (1969), stating:

> The only remaining issue is whether the present and future public convenience and necessity permits such abandonment. A more sophisticated refinement of this specification is whether or not the monetary loss to the line of the railroad sought to be abandoned would be outweighed by the inconvenience which such abandonment would cause to that part of the public served thereby.

In the typical railroad abandonment proceeding, therefore, if the abandonment is contested, protestors will attempt to present evidence rebutting the railroad's contention that the line in question is a heavy burden on the railroad's overall operation and demonstrating the community's concern that abandonment would severely damage local public interests. The Commission weighs the two alleged burdens to determine if the abandonment should be approved.

At the heart of the dispute in the present case is the question whether the new I.C.C. rules change that weighing process, thus establishing a new substantive law of abandonment. The I.C. C. contends no change is foreseen; plaintiffs contend the process will be fundamentally altered.

In an effort to realistically meet the mounting number of abandonment applications [3] with procedures that would accelerate their disposition and assist in finding sensible solutions to the current excess capacity of the railroad industry, the Commission announced the new rules in question here.[4] These rules were based upon staff studies of railroad abandonment cases.[5] The studies were conducted to determine "procedural standards for avoiding unnecessary protraction of litigation." In introducing the rules, the I.C.C. stated:

> A large majority of the abandonment cases decided by the Commission in the past 10 years have been unopposed by the general public or specific shippers. The record in such cases generally shows that there is little or no traffic moving over the lines of railroad (hereinafter referred to as "abandonment trackage"); that there are little or no prospects for additional tonnage; that the abandonment trackage is generally in poor physical condition, with operations thereover substantially slowed down for reasons of safety; and that the materials that can be salvaged after the abandonments frequently can be sold or used to public advantage in the operations of the applicant and in the public interest. Based on this experience in abandonment proceedings, it is appar-

---

3. The I.C.C. reports that in fiscal 1971, railroads filed 241 abandonment applications, more than double the number filed the previous year. 85th Annual Report of the Interstate Commerce Commission 35 (1971).

4. The I.C.C. reacted immediately to the surge in abandonment applications by introducing new procedures and practices to expedite their processing. It had promulgated in 1971 a new rule, 49 C.F.R. §§ 1121.1–1121.5, revising the "long-form" abandonment application forms and procedures which had been in effect since 1941. This rule was published without prior notice, no appeal was taken, and it became effective April 20, 1971. The Commission, however, believed that further streamlining was necessary, and thus promulgated the rules now attacked.

5. "The staff found that 98% of the abandonment applications decided in the two years from July 1, 1969, through June 30, 1971, involving more than 3,000 miles of trackage had been granted." *See* Defendant's Brief, p. 4.

ent that the same long-form application and its attendant procedures are not warranted in all instances.

The rules establish two "short form" procedures railroads may follow in seeking abandonment certificates. Subpart B's procedure may be used by a railroad wishing to abandon lines "where the requirements of public convenience and necessity [for continuation of the line] are minimal or nonexistent." In the subpart B application, the I.C.C. has established a rebuttable presumption that public convenience and necessity no longer require maintenance of a line if fewer than 34 carloads of freight per mile were carried on it in the year preceding the application.[6] However,

> [t]he prima facie case thus established may be rebutted by evidence establishing that the public convenience and necessity requires continued maintenance and/or operation of the said line of railroad. Unless a party opposing the abandonment indicates by a proffer of substantial evidence that it would be able to rebut the presumption, a certificate permitting the proposed abandonment shall be issued without further formal proceedings.

49 C.F.R. § 1121.23. Protestants must file their proffers of evidence within 20 days of the final date of the notice of the abandonment by publication in local newspapers, required by 49 U.S.C. § 1(19). § 1121.21(c).

The second "short form" procedure, in Subpart C, may be used by railroads wishing to abandon lines when they anticipate no significant and material public objection. If no significant and material public objection is forthcoming within 20 days of the final newspaper publication of notice of the abandonment application, the Commission may with-

out a hearing rule on the abandonment application. 49 C.F.R. § 1121.32(c). If such objection, on the other hand, is forthcoming, the railroad must either withdraw the application or resubmit it under Subparts A or B. 49 C.F.R. § 1121.35.

■■ In considering whether these new procedures alter the substantive law of abandonment, we note first that there is no statutory requirement that the Commission hold hearings on railroad abandonment applications. The statute, 49 U.S.C. § 1(19), allows the Commission to "prescribe from time to time" "rules and regulations as to hearings." Although the statute also grants the governor of the state in which the line to be abandoned runs a "right to be heard" on the application, it does not require formal proceedings. As the court held in affirming the grant of an abandonment application in Brotherhood of Locomotive Engineers v. United States, 217 F.Supp. 98, 100 (N.D.Ohio 1963):

> There is thus no statutory requirement of a hearing in that first sentence [of 49 U.S.C. § 1(19)]; rather, such matters are clearly left to the Commission's discretion . . . .

> Thus, both in regard to such hearings as may be accorded to private parties and to the governors of the respective states, the determination of whether hearings will be held is expressly left to the Commission.

*Accord*, Woodruff v. United States, 40 F.Supp. 949, 953 (D.Conn.1941). *Cf.* Frozen Foods Express, Inc. v. United States, 346 F.Supp. 254, 260–261 (W.D. Texas 1972); Allied Van Lines Co. v. United States, 303 F.Supp. 742, 746–749 (C.D.Calif.1969) (No statutory or constitutional right to oral hearings found for I.C.C. motor carrier applications.)

---

6. A profile of cases underlying the Commission's study of railroad abandonment cases reveals that of the 39 cases in the staff study, abandonment was authorized in 35. Deficit operations were present in all but three.

The Commission, in its order of January 14, explained that on the basis of its findings in the study cases, and on applied statistical analysis, it had determined that "on the average for a 12 month period, 34 carloads of freight traffic per mile of abandonment trackage are necessary to enable a railroad to operate the trackage on a break-even basis."

The right to be heard is preserved under the new I.C.C. rules; their effect is only to set guidelines for determination of the necessity of formal proceedings or hearings. Parties opposing abandonment are under no circumstances prevented from presenting to the I.C.C. documentary evidence supporting their positions, and the rules in no way excuse the Commission from considering such evidence before ruling on the abandonment.

 Although under some circumstances the new rules will allow the I.C. C. to dispense with formal proceedings or hearings, we do not find in either procedure an announcement that the Commission will no longer weigh the relative burdens on the railroad and on the community before granting an abandonment certificate. The Brief for the I.C. C. [at p. 27] states explicitly:

> Moreover, the new rule does not eliminate the Commission's weighing

the needs of both intrastate and interstate commerce and the benefits of abandonment against the inconvenience or loss to which others may be subjected.

The necessity for formal proceedings is eliminated in a Subpart B application if substantial evidence [7] is not proffered to rebut the presumption that a line carrying less than 34 carloads per mile per year is no longer necessary. The necessity for weighing the burdens on the railroad against the burdens on the local community, however, is not affected.[8] Similarly, in Subpart C proceedings, the Commission will still weigh the respective burdens before granting an abandonment petition. All the short form allows is dispensation with hearings should substantial public opposition not arise within 20 days. *See* 49 C.F.R. § 1121.32(c).[9]

Pennsylvania argues that the nature of the weighing process will be greatly

---

7. The Commission has indicated to the court that the term "substantial evidence" in 49 C.F.R. § 1121.23 has the same meaning as the term has in 5 U.S.C. § 706(2)(E).

8. The I.C.C. order, 49 C.F.R. § 1121.23 reads: "unless a party opposing the abandoment indicates by a proffer of substantial evidence that it would be able to rebut the presumption, a certificate permitting the proposed abandonment shall be issued without further formal proceedings." We do not read this order to require granting of an abandonment application whenever there is not a substantial proffer of evidence from protestors; we do read it to permit the I.C.C. to avoid further formal proceedings when it has not had substantial evidence proffered to it.

The Commission has indicated to this court that the evidentiary record will be closed following a determination that substantial evidence—justifying holding of further formal proceedings—has not been proffered. Therefore a determination that further formal proceedings were not required *would foreclose any use of the* Commission's "modified procedures," 49 C.F.R. § 1100.45–54, to further develop the evidentiary record. Nonetheless, we do not interpret the new Subpart B procedures to allow the I.C.C. to automatically grant an abandonment certificate fol-

lowing a determination that substantial evidence had not been proferred. Whatever evidence is in the record must be considered in the weighing process required before granting any abandonment application.

Any party aggrieved by a ruling that substantial evidence had not been proffered will be able to invoke the appellate procedures within the I.C.C. as provided by 49 U.S.C. § 17(6). The Commission has informed this court that its normal practice is not to make abandonment approvals effective until 35 days from the date of service. Further stays may be sought if needed to allow completion of administrative appellate review in accordance with 49 U.S.C. § 17(8). And, following administrative review, judicial review of denial of formal proceedings will be available. Stays of abandonment approvals may also be sought from the courts.

9. The Commission has indicated to this court that the term "hearings" in Subpart C embraces modified procedures pursuant to 49 C.F.R. § 1100.45–54. We therefore *interpret a Commission determination that* hearings are not required because of an absence of significant and material public objection to have the same exact effect as described for a determination that formal proceedings are not required under Subpart B. *See* footnote 8 *supra.*

altered by the new procedures. It argues that in the past the burden of proof has always been on the railroad seeking the abandonment, and that the protestors have never had to make out a case against the abandonment in order to convince the I.C.C. not to issue the certificate. Pennsylvania argues further that the railroad has traditionally had to present convincing proof of every element of its case for abandonment. The rebuttable presumption, therefore, argues Pennsylvania, changes the substantive law by placing for the first time a burden of proof on opponents of abandonment.

We do not find that the substantive law or the burden of ultimate persuasion has been changed. It is true that statutes such as 49 U.S.C. § 1(19), which authorize abandonments subject to what public convenience and necessity will permit, have been interpreted to place the burden of ultimate persuasion on the proponent of abandonment. Michigan Consolidated Gas Co. v. Federal Power Commission, 108 U.S.App.D.C. 409, 283 F.2d 204, 214 (1960). The I.C.C. itself has recognized that the proponent should shoulder such burden of proof. New York Central R. Co. Abandonment, 312 I.C.C. 587, 596 (1961). Placing the burden on the proponent is consistent with the procedure specified in the Administrative Procedure Act, 5 U.S.C. § 556(d). We do not regard the new rules as changing the applicant's burden of showing the Commission that the public interest will not be disserved by the proposed abandonment.

The new Subpart B rule merely creates a rebuttable presumption [10] that public convenience and necessity do not require the continued operation of a portion of a line of railroad upon submission of proof by a carrier that, on the average, fewer than 34 carloads of freight per mile were carried on the abandonment trackage during the preceding 12-month period. The rule of the Commission does not shift the burden of persuasion which remains with the carrier as the party claiming affirmative relief. Its effect, as described by the Commission, is merely "to shift to the protestants the burden of going forward with the evidence." This obligation of going forward with evidence is customary in adjudicatory proceedings once the other party has established a prima facie case.

A rebuttable presumption rule is not unique in administrative or judicial proceedings and can be a useful tool in expediting the proceedings.[11] In the abandonment proceedings, it shifts the burden of going forward with evidence— this burden may shift from time to time during a given proceeding—"after the applicant has established its prima facie case on the basis of the statistical standard incorporated herein." 37 F.R. 1046. It merely recognizes and puts to use as a procedural mechanism what the Commission's staff studies have empirically developed—an inference from which a prima facie case for abandonment is made. It is not conclusive and may be rebutted by the protestants coming forward with their evidence.

Both Subparts B and C do explicitly place a burden of coming forward with evidence on opponents of abandonment if they wish formal proceedings before the Commission before an application is acted upon. This production burden is not new. Opponents of abandonments have always shouldered it in the past. Unless such opponents presented the I. C.C. with substantial evidence that the

---

10. "The presumption is a rule for the conduct of the trial." Psaty v. United States, 442 F.2d 1154, 1161 (3d Cir. 1971). As such, it is a procedural device.

11. In suits for the recovery of taxes, a presumption of correctness attaches to the determination of the Commissioner of Internal Revenue's assessment and "allows the Government to establish a prima facie case of liability by merely offering into evidence a certified copy of the Commissioner's assessment." Psaty v. United States, 442 F.2d 1154, 1159 (3d Cir. 1971).

burdens on the local communities outweighed the burdens alleged by the railroad, it was very unlikely that the Commission, on its own, would make the evidentiary case against the railroad.[12]

◼ In determining whether the persuasion burden has been sustained, the Commission will continue to exercise its usual administrative discretion to draw a conclusion about relative burdens on public necessity and convenience "from the infinite variety of circumstances which may occur in specific instances." I.C.C. v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 1493, 89 L.Ed. 2051 (1945). To support any determination, the I.C.C. will continue to need substantial evidence in the record. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); now codified as 5 U.S.C. § 706(2)(E); Asbury v. United States, 298 F.Supp. 589, 591 (W.D.Va. 1969). And, thus, the obligation of proponents of abandonment remains to provide the Commission with evidence necessary to demonstrate that the burden on the railroad outweighs the burden abandonment would impose on communities affected, even if the absence of public objection or proffer of substantial evidence precludes the necessity of formal proceedings. The duty of the Commission to weigh all evidence in the record will be maintained, whether or not formal proceedings are held.

◼ Plaintiffs argue that a carrier seeking abandonment must prove every element of its claim that public necessity and convenience permit abandonment of a line. They view the new rules as a change in this requirement. Plaintiffs, in so arguing, misapprehend the substantive law of abandonment and the effect of the new rules. The only element of an abandonment application which must be proven is that the burden on the railroad, and thus on other commerce, outweighs the burden on the communities affected by abandonment. Courts have held consistently that failure to prove one element of an abandonment application allegation is not determinative of the application's disposition. Purcell v. United States, 315 U.S. 381, 62 S.Ct. 709, 86 L.Ed. 910 (1942) (profitability of line in the past does not prevent grant of abandonment application under certain circumstances); Asbury v. United States, 298 F.Supp. 589 (W. D.Va.1969); and Washington and Old Dominion Users Assn. v. United States, 287 F.Supp. 528 (E.D.Va.1968) (evidence that overall railroad is profitable and thus losses on line to be abandoned would be a light burden not determinative that abandonment should be allowed). Cf. Colorado v. United States, 271 U.S. 153, 169, 46 S.Ct. 452, 70 L.Ed. 878 (1926). None of the I.C.C. cases cited by plaintiffs holds otherwise. In each, the sole determinative element which had to be proven to support an

12. The traditional necessity for opponents of abandonment to present evidence rebutting carrier claims has been noted by several commentators. Professor Cherington, in his The Regulation of Railroad Abandonments 133 (1948), put it this way:

> It is not enough simply for large numbers of witnesses to appear at the hearing and protest. They must be prepared to bring forward convincing evidence not only that they would like the line continued but that they need to have it continued as a matter of necessity. The testimony must persuade the Commission that there is a prospect that the railroad will be used to a suf-

ficient extent to give some prospect of its being able to support itself.

The necessity for convincing evidence from opponents was emphasized in Conant, Railroad Mergers and Abandonments 124 (1964):

> The great majority of abandonment petitions are granted because the losses of the line in question are proved to be substantial and because there is no reasonable prospect of future profitable operations. They are found to be a burden on interstate commerce. In such cases, a clear public necessity must be shown by protestants before a carrier will be denied abandonment.

abandonment was that public convenience and necessity supported it.[13]

We are not unmindful of the difficulties, emphasized by plaintiffs at oral argument, which states and local communities face in developing evidence that public necessity requires continued operation of a line or that the burden on the railroad is less severe than the carrier alleges it to be.[14]

■ Plaintiffs were especially critical of the twenty day deadlines included in both Subparts B and C. A twenty day deadline for the state to notify the Commission of objections, after notice has been given of the abandonment application, however, already exists under the long form, Subpart A, procedure. 49 C. F.R. § 1121.5(b). The twenty day limit under the new procedures does not begin running until all public newspaper notices have been run; these notices must appear in local newspapers for three consecutive weeks. 49 U.S.C. § 1(19); 49 C.F.R. § 1121.21(c).[15]

Moreover, opponents of an abandonment need not prove within twenty days that there is substantial evidence indicating the abandonment should not be granted under either short form. To answer a Subpart B application and demonstrate a need for formal proceedings, the opponents need only "proffer . . . substantial evidence." To proffer evidence is to "tentatively advance [it] for consideration." *Webster's Third New International Dictionary, Unabridged* (1966). To demonstrate the need for formal proceedings following a Subpart C application, opponents need not only file documentation with the Commission within the twenty days that "public objection is significant and material." We do not find either requirement unreasonable; both are consistent with a legitimate goal of the Commission to expedite abandonment determinations.

We note further that even if the Commission should find no need for further formal proceedings after filing of Subpart B or C applications, opponents of abandonment will continue to have recourse to the courts to challenge the I. C.C. should it, upon weighing relative burdens, grant the application.[16] To be sustained, the I.C.C. will need substantial evidence in the record to show that public convenience and necessity permitted the abandonment. The I.C.C., it can be safely assumed, will have considered any proffers of evidence or public objections, even if it had found either insufficient to warrant formal proceedings. Only if the evidence presented by propo-

---

13. *See* Pere Marquette Ry. Co. Abandonment, 72 I.C.C. 267 (1922); Oklahoma Northern Ry. Co. Abandonment 72 I.C.C. 625 (1922); Chicago, Peoria, & St. L. Ry. Co. Abandonment, 76 I.C.C. 801 (1923); Frankfurt & Cincinnati Ry. Co. Abandonment, 86 I.C.C. 740 (1924); Hill City Ry. Co. Abandonment, 150 I.C.C. 159 (1928); Dawson Ry. Co. et al. Abandonment, 295 I.C.C. 273 (1956); Southern Pacific Company Abandonment, 320 I.C.C. 38 (1963).

14. The new rule permits opponents of abandonment to use all resources available to them for the production of evidence. It specifically directs their attention to the availability in appropriate circumstances, of the Commission's "discovery procedures as provided in the Commission's General Rules of Practice, 49 C.F.R. 1100.56–1100.67." 37 F.R. 1046.

15. The I.C.C. has established as part of the Subpart C application procedure a requirement that all shippers who have used the line to be abandoned within the previous twelve months and all prospective shippers newly located on the line must be notified of the abandonment application on or before the date the application is filed. 49 C.F.R. § 1121.32(c)(2). No such notice requirement previously existed under the long form, Subpart A, procedures, nor has one been added. The notice requirement for Subpart C applications, however, does indicate the I.C.C. is not attempting to preclude the opportunity for "significant and material objection" to the abandonment to crystallize.

16. Opponents of abandonment will also enjoy the right under 49 U.S.C. § 17(6) to "make application [to the Commission] for rehearing, reargument, or reconsideration," of any decision to grant an abandonment.

nents of abandonment was sufficient to outweigh the burdens claimed by opponents will the abandonment certificate be judicially sustained.

Plaintiffs concentrate their arguments against the new I.C.C. procedures on the 34 carload presumption.[17] They note that the amount of traffic on a given line is but one factor which the I.C.C. should consider in passing on an abandonment application, and they envision instances where a railroad will present to the I.C.C. no evidence other than that a given line carried, for example, 33 carloads per mile during the previous year. They fear that the Commission, because it has erected the rebuttable presumption, will thus be able to deem any public objection insubstantial, and in effect, grant the application on a mere showing of light traffic.

We do not interpret the new I.C.C. rules to make possible such a result. As we have already emphasized, the Subpart B and C procedures to not dispense with the necessity for the Commission to weigh the relative burdens; nor do they change the traditional rule that an infinite variety of circumstances may be included in the weighing process; nor will the denial of formal proceedings allow the I.C.C. to therefore ignore the record; nor will the new rules alter the standard of review in judicial challenges. The rebuttable presumption merely permits the disposition of the case on the record without formal proceedings when substantial evidence is not proffered by opponents of the abandonment.

Remaining for the Commission, and for courts reviewing the Commission decision, is the question of how much weight to give the 34 carload presumption in determining whether substantial evidence exists to grant an abandon-

ment. In the past, no particular mathematical formula has been given special consideration. The figure "34" was chosen by the Commission from its staff study because "it has been determined that, on the average for a twelve-month period, 34 carloads of freight per mile of abandonment trackage are necessary to enable a railroad to operate the trackage on a break-even basis." Abandonment of Railroad Lines, Ex Parte No. 274 (Sub-No. 1).

Plaintiffs point out that of the thirty-nine abandonment proceedings studied to determine this arithmetical mean, twenty-one involved railroad lines which could have operated at a profit with 34 carloads per mile per year. This result is, however, totally predictable and understandable, as approximately half of any set of figures used to determine a mean will normally be above the mean. Plaintiffs also attacked the 34 carload rule at oral argument on the ground that the presumption would attach in many applications where the lines sought to be abandoned were still profitable. Plaintiffs argued that profitability was often of central concern in abandonment proceedings and that the 34 carload rule would eliminate consideration by the Commission of profitability.

The rule does not provide that a mere showing of 33 carloads per mile is conclusive evidence that the abandonment should be granted. If, for example, an abandonment application merely offered evidence that 33 carloads per mile of a very valuable cargo were carried, and the line was highly profitable, the I.C.C. might nonetheless reject the application even if substantial evidence opposing the abandonment was not proffered and hearings were not held. The I.C.C., in weighing relative burdens, might well determine after considering the evidence that the burden on the railroad of con-

17. Although plaintiffs have made no specific arguments against the Subpart C procedures, the original complaint attacked both Subparts B and C, and we have considered both on their merits.

tinued operation was too slight to allow abandonment.[18]

Plaintiff's argument on the weight to be attached to the 34 carload rule is unpersuasive *for two major reasons*. First, as we have emphasized, the I.C.C., even under the short form procedures, must continue to take into account and weigh many factors other than the amount of traffic on the line. Profitability will continue to be a factor to be considered. Second, it is inherent *in the weighing process that profitability alone does not establish that a line should not be abandoned*. *See, e. g.,* Purcell v. United States, 315 U.S. 381, 62 S.Ct. 709, 86 L.Ed. 910 (1942).

Although it is true a minimally profitable line may impose but a slight burden on an overall railroad, even that slight burden may outweigh the local interest in maintenance of the line. The burden of a minimally profitable line exists because of the nature of the regulated railroad industry. Until a certificate of abandonment is granted, a railroad is required to provide services on its tracks. To provide these services, expenditures will be required to maintain the line in operating condition. Expenditures used on this line will not be available for maintenance of other more profitable lines. It is thus possible for a railroad, limited in its ability to finance track rehabilitation and improvements, to be hindered in its provision of more essential service on other lines by the need to maintain minimally profitable lines. A burden on other commerce may be present, therefore, in maintaining even a profitable line. It is therefore unreasonable for the plaintiffs to assume the I.C.C. must always turn down applications for abandonment of profitable lines.

18. The effect of the rebuttable presumption can be analogized to a common judicial circumstance involving burdens of production and persuasion. As discussed in McCormick on Evidence (2d Ed. 1972) § 338, at 791–92, the problem is this:

Suppose the one who had the initial burden of offering evidence in support of the alleged fact, on pain of an adverse ruling, does produce evidence barely sufficient to satisfy that burden, so that the judge can just say, "A reasonable jury *could* infer that the fact is as alleged, from the circumstances proved." If the proponent then rests, what is the situation? Has the duty of going forward shifted to the adversary? Not if we define that duty as the liability to a peremptory adverse ruling on failing to give evidence, for if at this juncture the original proponent rests and the adversary offers no proof, the proponent will not be entitled to the direction of a verdict in his favor on the issue, but rather the court will leave the issue to the decision of the jury. But it is frequently said that in this situation the duty of going forward has shifted to the adversary and this is unobjectionable if we bear in mind that the penalty for silence is very different here from that which was applied to the original proponent. If he had remained silent at the outset he would irrevocably have lost the case on this issue, but the only penalty now applied to his adversary is the risk, if he remains silent, of the jury's finding against him, though it may find for him. Theoretically he may have this risk still, even after he has offered evidence in rebuttal. It is simpler to limit "duty of going forward" to the liability, on resting, to an adverse ruling, and to regard the stage just discussed (where the situation is that if both parties rest, the issue will be left to the jury) as one in which neither party has any duty of going forward.

In the context of I.C.C. abandonment proceedings under Subpart B, the railroad begins with the production burden; it satisfies it by demonstrating that less than 34 carloads per mile were carried on the line to be abandoned. A production burden is then placed on the opponents of abandonment, but, as in McCormick's example above, failure to sustain that production burden is not determinative of the outcome of the case. The I.C.C. situation is somewhat different because failure to sustain the production burden by abandonment opponents results in denial of formal proceedings; however, that failure does not allow the I.C.C. to disregard the record developed by the opponents. Just as in the McCormick example, the trier of fact must weigh all evidence.

■ To sum up, we hold that the new I.C.C. rules, announced in Abandonment of Railroad Lines, Ex Parte No. 274 (Sub-No. 1), do not change the substantive law of railroad abandonment as expressed in 49 U.S.C. § 1(18)–(20). The changes announced by those rules merely establish procedural guidelines for disposition of abandonment applications and dispensation with formal hearings, when necessary. Such changes are within the statutory authority of the Commission to make "rules and regulations" for abandonment hearings. 49 U.S.C. § 1(19). We must next turn to consideration of whether the new rules promulgated by the I.C.C. were consistent with the requirements of the A.P.A.

### III. ADMINISTRATIVE REQUIREMENTS

■ Plaintiffs argue that promulgation of the new I.C.C. rules should have been done in compliance with § 4 of the Administrative Procedure Act, 5 U.S.C. § 553, and thus the public should have been given an opportunity to participate in the rulemaking. They argue the provisions of § 4 must be fulfilled because the 34 carload rule is "substantive", rather than "procedural", as it was originally labeled by the Commission in its announcement of the rules on January 14, 1972. Alternatively, plaintiffs argue, even if the new rules are not labeled "substantive", they will, nonetheless, have a substantial impact on the interests of many states and communities, and thus the requirements of § 4 are mandated. The I.C.C. contends that promulgation of the new rules was an exercise of procedural and interpretive rulemaking which need not conform to the § 4 requirements.

Administrative Procedure Act § 4, titled "Rule Making", requires general public notice of such proceedings and an opportunity for interested persons to "participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." These requirements, however, do not apply to "in-terpretive rules, general statements of policy, or rules of agency, organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A). The threshold question here, therefore, is whether this exception covers the I.C.C. rules in question, i. e., whether the new rules are procedural or interpretive, rather than substantive.

In Part I of this opinion, we explicated our views that the Subparts B and C rules are not substantive changes, but merely changes in procedure and practice. They, therefore, need not be promulgated in compliance with § 4. They do not involve substantive changes as were considered in Pacific Coast European Conference v. Federal Maritime Commission, 126 U.S.App.D.C. 230, 376 F.2d 785 (1967) (promulgation of requirements for inclusion in shipper conference agreements); American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966) (rules permitting all-cargo carriers to sell block space at wholesale rates); or Pacific Coast European Conference v. United States, 350 F.2d 197 (9th Cir. 1965) (rules governing shippers' contract rate systems.)

■ We will, nonetheless, consider whether the new I.C.C. rules will have the type of "substantial impact" on parties, such as plaintiffs in this case, as to require § 4 notice and hearings. The "substantial impact" test was announced by a three-judge statutory court in National Motor Freight Traffic Assn. v. United States, 268 F.Supp. 90 (D.D.C. 1967) aff'd 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). There, plaintiffs sought to nullify the I.C.C.'s establishment of an informal procedure for repayment to shippers of past charges which the carrier acknowledged to have been illegal. Plaintiffs claimed the rules establishing these procedures should have been promulgated only after notice and compliance with the § 4 proceedings. The I.C.C. argued the new rules fell within the procedural exception of A.P.A. § 4, 5 U.S.C. § 553(b)(3)(A). The Court did not de-

cide whether establishment of these informal procedures was within the I.C.C.'s statutory authority, but held that even if it were, the proceedings had to be consistent with § 4's requirements because the new procedures specifically and definitely committed the Commission to an adjudication of the propriety of a return by a carrier to a shipper of charges theretofore collected.

> Such an adjudication may, as we have seen, have palpable effects upon other carriers and shippers; and it is no answer to say that it creates no substantive rights because it is provided by the Commission only for those who voluntarily choose to use it.

268 F.Supp. at 96.

The substantial impact test was used again in Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858 (D.Del.1970), to find a need for § 4 proceedings before the Food and Drug Administration established "regulations, which prescribe in specific detail, for the first time, the kinds of clinical investigations which will be deemed necessary to establish the effectiveness of existing and future drug products and which require such evidence be submitted as a condition to avoiding summary removal from the market." 307 F.Supp. at 864.[19]

The "substantial impact" found in *National Motor Freight* and in *Pharmaceutical Manufacturers,* however, does not exist in the case *sub judice.* The informal reparation procedures considered in *National Motor Freight* permitted the I.C.C. to informally adjudicate the illegality of freight charges for services previously rendered by the carrier, and,

thus, approve reparations which might "have palpable effects upon other carriers and shippers." The impact of the rate procedures on shippers would be felt when their rates were passed on in subsequent reparation proceedings. 268 F.Supp. at 96. In the present case, however, the new procedures are mechanistic, not substantive, and all affected parties have notice of the abandonment proceedings, and an opportunity to submit evidence.

In *Pharmaceutical Manufacturers,* the proposed informal procedures jeopardized the sale and distribution of more than 2,000 products which were marketed with FDA approval and placed all of them in jeopardy, "subject to summary removal by order of FDA." The FDA Commissioner did not deny that the new, informal regulations "will have a substantial and pervasive effect on the drug industry." 307 F.Supp. at 864. In this case, the new regulations do not jeopardize the substantive rights of any parties. The only impact on opponents of railroad abandonments is to accelerate the preparation of their case and proffer of evidence if formal proceedings are desired.

The substantive law which the Commission will apply in determining whether abandonment certificates should be granted has not been changed. Unlike *National Motor Freight,* the new procedures established will not create substantive effects upon the rights of parties not involved in the proceedings. Unlike *Pharmaceutical Manufacturers,* no services or products formerly available to the public may be summarily removed from the market.

---

19. Plaintiffs also argue, in their application of the "substantial impact" test, that Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir. 1969) and Kelly v. United States Department of Interior, 339 F.Supp. 1095, 1100–1102 (E.D.Calif.1972), also support its applicability to the present case. In both of these cases, however, the agency was arguing compliance with § 4 was not necessary because the rule was insignificant and thus fell in the separate exception to § 4 provided by 5 U.S.C. § 553(b)(3)(B), rather than subsection (A) which is involved here. Substantial public impact is obviously important for that exception, as it provides public notice and hearing are not required if the agency for good cause finds such proceedings "unnecessary." The substantive nature of the rules challenged in those cases was clear. 412 F.2d at 742; 339 F.Supp. at 1097–1098.

222

We therefore find no substantial impact on plaintiffs, or other parties who might oppose railroad abandonments, caused by the new I.C.C. rules, which necessitates compliance with § 4 of the A.P.A. We need not determine whether consideration of petitions for reconsideration of the rules, as undertaken by the I.C.C., cured the original failure to allow public input into the rulemaking process. *See* Warner Electric Corporation v. Volpe, 466 F.2d 1013, 1020 (3d Cir. 1972). This issue, as argued by the parties, is moot since we have determined that the requirements of § 4 for public participation in rulemaking do not apply to the rules *sub judice*.

 Having found that the I.C.C. need not have complied with § 4 of the A.P.A. in promulgating the new rules in question, and noting that it did comply with A.P.A. § 3, 5 U.S.C. § 552(a)(1)(C), by publishing these new procedural rules in the Federal Register, the only determination left for us is whether the new procedural rules are arbitrary and capricious. 5 U.S.C. § 706(2)(A); Kessler v. Federal Communications Commission, 117 U.S.App.D.C. 130, 326 F.2d 673, 683–689 (1963); Ranger v. Federal Communications Comission, 111 U.S.App.D.C. 44, 294 F.2d 240, 243–244 (1961); *cf.* Federal Communications Commission v. Schreiber, 381 U.S. 279, 295, 85 S.Ct. 1459, 14 L. Ed.2d 383 (1965). The Commission has statutory authority to prescribe rules and regulations governing its procedures. 49 U.S.C. §§ 12(1), 17(3). This authority has been interpreted to give administrative agencies broad discretion in determining the methods which would best permit them to perform statutory functions. Federal Communications Commission v. Schreiber, 381 U.S. 279, 289, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

We believe the procedures adopted are a rational and salutory response to deal expeditiously with critical developments in the railroad industry. None of the parties are absolutely precluded from producing documentary or oral evidence to support their respective positions; and the burden of persuasion remains unchanged.

Plaintiff's complaint will be dismissed. An appropriate order will be entered.