**In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.**

**In re In Proceedings for the REORGANIZATION OF A RAILROAD.**

**No. 70–432.**

United States District Court, E. D. Pennsylvania.

May 2, 1974.

---

Duane, Morris & Heckscher by William R. Traub, and Robert L. Pratter, Philadelphia, Pa., for the trustees, Lehigh Valley Railroad Co., debtor.

Richard R. Bongartz, Philadelphia, Pa., for the trustees, Penn Cent. Trans. Co.

Michael I. Haley, office of chief counsel, Federal Railroad Transportation, for the U. S. Dept. of Trans., Washington, D. C.

Wilmer, Cutler & Pickering by Barry E. Carter, Washington, D. C., for U. S. Railway Ass'n.

Sullivan & Worcester by David M. Schwartz, Washington, D. C., for Lehigh Coal & Navigation Co.

Shearman & Sterling by John E. Hoffman, Jr., and Matthew C. Gruskin, New York City, for First National City Bank of New York, as indenture trustee.

Stern, Maxmin & Stern by I. Jerome Stern, Philadelphia, Pa., for A. C. Speyer, Jr., bondholder, Lehigh Valley Harbor Terminal.

Morgan, Lewis & Bockius, by Edward B. Cloues, II, Philadelphia, Pa., for The Fidelity Bank and Manufacturers Hanover Trust Co.

Strong, Barnett, Hayes & Quinn by William P. Quinn, Philadelphia, Pa., for Delaware & Hudson Railway Co.

T. P. Shearer, Pittsburgh, Pa., for United Trans. Union.

Gordon P. MacDougall, Washington, D. C., for the Commonwealth of Pennsylvania.

Leroy D. Touchton, Trenton, N. J., for the State of New Jersey.

Ballard, Spahr, Andrews & Ingersoll by Oliver Caldwell Biddle, Philadelphia, Pa., for indenture trustees.

Alfred N. Lowenstein, Harrisburg, Pa., for Pennsylvania Public Utility Commission.

Mulholland, Hickey & Lyman by Geoffrey N. Zeh, Washington, D. C., for Railway Labor Executives' Ass'n.

## MEMORANDUM AND ORDER NO. 245, and FINDINGS PURSUANT TO THE FIRST SENTENCE OF § 207(b) of the Regional Rail Reorganization Act of 1973

FULLAM, District Judge.

Section 207(b) of the Regional Rail Reorganization Act of 1973 (hereinafter the "Act"), provides:

"Within 120 days after the date of enactment of this Act each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. § 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act. . . ."

The Debtor is a "railroad in reorganization" as defined in the Act. The statute became effective January 2, 1974, which means that the decision as to reorganizability is to be made not later than May 2, 1974.

By Order No. 218, this Court directed that a hearing be held on April 8, 1974, in relation to the decision required by the quoted language of the statute, and invited all interested parties, at stated times in advance of the hearing, to specify and brief the legal and factual issues they deemed relevant to the required determination. In response to this invitation, a number of questions have been briefed and presented.

The facts relevant to the ability of the Debtor to reorganize have been pre-

viously explored in detail in conjunction with the Trustees' March 13, 1973 petition to terminate rail operations (Document No. 530). It was the Trustees' position at the June 1973 hearing on their termination petition that earning power adequate to support a plan of reorganization was lacking, and that additional diminution of the value of the estate from accruing administration expenses would invade the Fifth Amendment rights of the Debtor's secured creditors. Opponents of termination argued that the status quo should be preserved until the Congress completed action on the then pending Northeast rail crisis legislation, and that, in any event, the Court was without power to order termination of rail operations. In view of the imminent prospect of legislation, disposition of the Trustees' petition was deferred.

The findings made herein are based on the records of the June 1973 and April 1974 hearings. Although it is to be hoped that these findings will expedite further proceedings in this case, no ultimate finding or conclusion pertaining to the Trustees' petition to terminate is now being made. Rather, the Trustees' termination petition will be considered in conjunction with the hearing required by the second sentence of § 207(b) of the Act.

The issue to be considered now is whether the Debtor is reorganizable within the meaning of § 207(b). At the hearing, only the Commonwealth of Pennsylvania urged an affirmative answer. But the record simply does not support the Commonwealth's contention that the Debtor can be reorganized as an independent operating carrier. Moreover, reorganization through absorption into the Penn Central is less than realistic, as is the suggested combination of some of the smaller bankrupt carriers to form the so-called Mid-Atlantic Railroad (see Finding 51). This is particularly true since both the Penn Central and the Reading have been found not reorganizable under the § 207 (b) criterion, and, therefore, at least as of this date, these carriers will be reorganized under the Act.

Certain legal issues which were raised in the Penn Central § 207(b) proceeding have also been raised here. The discussion of these issues in Parts I and II of the Memorandum and Order No. 1543 in the Penn Central proceedings is incorporated herein by reference.

## FINDINGS OF FACT

1. The Lehigh Valley Railroad Company (hereinafter LV) is a Pennsylvania corporation with its executive offices in Bethlehem, Pennsylvania.

2. A petition for reorganization under § 77 of the Bankruptcy Act was filed by LV and approved by this Court on July 24, 1970.

3. The LV had previously obtained relief from pressing financial difficulties under the Bankruptcy Act in 1939 and under § 20b of the Interstate Commerce Act in 1949. Both proceedings resulted in substantial modification of LV's debt structure.

4. Penn Central Transportation Company owns 97% of the stock of LV.

5. Railroad operations are conducted by the LV in the States of New Jersey, New York and Pennsylvania. The main line extends from Buffalo, New York to Jersey City, New Jersey, via Pennsylvania. Significant branch lines serve various areas in proximity to the main line service.

6. More specifically, the main line originates in Buffalo, New York; runs directly east to Geneva, New York; then in a southwesterly direction to Van Etten, New York, where the main line crosses the Pennsylvania border at Sayre, Pennsylvania; then down through Pennsylvania where the main line crosses into New Jersey at Phillipsburg; and thereafter the line runs in a generally northeasterly direction through New

Jersey to Newark and Jersey City. The main line described above accounts for 442.6 miles of the LV's total of 972 miles of track.

7. LV interchanges with other carriers at the following locations: In New Jersey: Jersey City, Oak Island, Newark, Perth Amboy, Manville and Phillipsburg; in Pennsylvania: Bethlehem, Allentown, Northampton, Palmerton, DuPont and Wilkes-Barre, and Croxton; and in New York: Geneva, Waverly, Oswego, P & L Junction, Buffalo, and Suspension Bridge. Of the 2,698 persons employed by the LV, approximately 451 are employed in New Jersey, 1797 in Pennsylvania, and 390 in New York.

8. LV's operating plant (tracks, signals, switches and associated facilities) is of high quality. Few railroads have as much heavy rail, new ties and heated switches per mile as the LV.

9. Although the physical plant of the LV has been maintained to high standards during reorganization, nevertheless the plant was in worse condition in June of 1973 than it was on July 24, 1970, the date LV's petition was filed.

10. LV's freight car and power equipment ownership and lease arrangements as of December 31, 1973 are reflected in the following chart:

11. Since 1970 the freight car fleet has been reduced from 5,463 cars to the present total of 3,932.

12. The percentage of cars out of service because of "bad order" decreased from 22.7% in 1970 to 19.1% in May of 1973. The bad order ratio is substantially above the national average.

13. The present condition of the LV's rolling stock is equivalent to or better than the condition at the time the LV filed its reorganization petition. However, the number of cars owned or leased has been reduced substantially due to retirement of equipment.

14. The LV does not have enough equipment available to handle its current level of business. In order to accommodate business, it is necessary for the LV to incur high per diem costs, notwithstanding the Trustees' efforts to achieve economies through better control of car utilization.

15. The locomotive fleet has been improved substantially by the acquisition of 4 new locomotives and the lease of an additional 12 locomotives. Although the LV's ownership and leasing arrangements for locomotives has increased an aggregate of only three locomotives, the number has proved adequate to handle the increased traffic.

16. Freight tonnage carried by the LV for the period 1962–1973 with 1962 used as a base year is set forth below. It should be noted that there is not an exact correlation between tonnage carried and revenue because different tariffs are applied to various commodities.

| KIND FREIGHT | OWNED | LEASED | TOTAL |
|---|---|---|---|
| Refrig. | 92 | 9 | 101 |
| Hopper | 60 | 0 | 60 |
| Covered Hopper | 478 | 177 | 655 |
| Gondola | 976 | 284 | 1260 |
| Box | 961 | 832 | 1793 |
| Flat | 52 | 2 | 54 |
| Misc. | 1 | 3 | 4 |
| Total | 2625 | 1307 | 3932 |
| NON-REVENUE | | | |
| Caboose | 97 | 0 | 97 |
| Misc. | 228 | 0 | 228 |
| Total | | | 4257 |
| LOCOMOTIVE | | | |
| Road | 41 | 30 | 71 |
| Switchers | 78 | 0 | 78 |
| Total | 119 | 30 | 149 |

(In Thousands)

| YEAR | TONNAGE | INDEX |
|---|---|---|
| 1962 | 16,285 | 100 |
| 1963 | 17,144 | 105 |
| 1964 | 16,633 | 102 |
| 1965 | 16,372 | 100 |
| 1966 | 16,096 | 99 |
| 1967 | 15,425 | 95 |
| 1968 | 14,495 | 89 |
| 1969 | 15,420 | 95 |
| 1970 | 14,644 | 90 |
| 1971 | 12,332 | 76 |
| 1972 | 16,405 * | 100 |
| 1973 | 18,928 * | 116 |

* As reported to ICC.

17. Pertinent financial results for the LV (under ICC accounting regulations) are reflected below:

| YEAR | TOTAL OPERATING REVENUE | INCOME AVAILABLE FOR FIXED CHARGES [1] | NET INCOME (LOSS) |
|---|---|---|---|
| 1953 | 76,338,798 | 11,329,293 | 6,970,630 |
| 1954 | 65,594,326 | 6,642,669 | 2,638,921 |
| 1955 | 68,911,233 | 9,212,034 | 5,599,213 |
| 1956 | 71,580,669 | 7,552,056 | 4,213,439 |
| 1957 | 67,577,152 | 2,076,325 | (1,188,379) |
| 1958 | 57,787,142 | (1,231,433) | (4,398,608) |
| 1959 | 54,425,811 | 709,908 | (2,402,114) |
| 1960 | 51,309,614 | ( 115,226) | (3,240,185) |
| 1961 | 44,241,167 | (4,890,625) | (8,320,297) |
| 1962 | 45,455,545 | (1,110,426) | (3,863,791) |
| 1963 | 45,471,834 | ( 421,494) | (3,232,024) |
| 1964 | 45,924,774 | ( 120,649) | (2,890,569) |
| 1965 | 44,958,551 | ( 481,462) | (3,131,004) |
| 1966 | 45,292,569 | ( 205,931) | (2,868,618) |
| 1967 | 44,957,070 | (1,171,353) | (3,737,516) |
| 1968 | 46,437,938 | (3,457,294) | (5,968,691) |
| 1969 | 48,819,312 | (2,375,583) | (7,539,684) |
| 1970 [2] | 48,252,010 | (6,575,107) | (10,405,879) |
| 1971 | 45,459,016 | (4,985,036) | (7,956,819) |
| 1972 | 51,129,082 | (8,237,897) | (17,693,020) [3] |
| 1973 | 58,057,385 | (6,386,191) | (7,626,355) [4] |
| 1974 | 62,184,679 [5] | | |

18. Car loadings for 1970, 1971, 1972 and 1973, respectively, were 308,588; 264,660; 346,605, and 389,130.[6]

19. The increase in total operating revenue from $45,459,016 in 1971 to $51,129,082 in 1972 is partially attributable to an increase in railroad freight revenue in 1972 of $4,983,833. The increased freight revenue arose from the lease of the Lehigh & Susquehanna Lines (L & S) as of April 1972 by the LV. It is estimated that 1972 freight revenue attributable to LV trackage, excluding the L & S Lines, was down $775,000.

20. Net profit on the L & S line for the last nine months of 1972 was approximately $1,962,000.

21. Continued rail operations have been made possible by the deferral of certain obligations accrued (and projected) as set out below. Order No. 226 requires the LV to pay 1974 Penn Central net settlements on a current basis.

(in thousands)

| | Total as of 12/31/73 | Year 1974 | Total as of 12/31/74 |
|---|---|---|---|
| Penn Central Net Settlements | $14,532 | | $14,532 |
| Wages (deferred payments) | 2,705 | $ 458 | 3,163 |
| Taxes | 1,816 | 1,016 | 2,832 |
| Subtotal | 19,053 | 1,474 | 20,527 |
| Interest on Debt | 8,798 | 2,270 | 11,068 |
| Total | $27,851 | $3,744 | $31,595 |

22. The projected cumulative cash balances for the end of each month in 1974, and the ending quarterly balances for 1975, are reflected below. These

1. Fixed charges include debt service, lease line and equipment rentals.

2. Date of reorganization July 24, 1970.

3. An extraordinary item of $5,886,912 resulting from damage occasioned by Hurricane Agnes is included in a total extraordinary charge of $6,185,074.

4. Includes extraordinary profit of $2,274,934 from sale of property after deduction of extraordinary losses.

5. Forecast.

6. As reported to ICC.

cash forecasts reflect the impact of Order No. 226.

1974 [7]

| | |
|---|---|
| Jan.–$4,266,000 | July–$ 774,000 |
| Feb.– 4,311,000 | Aug.– ( 311,000) |
| Mar.– 3,088,000 | Sept.– ( 711,000) |
| Apr.– 2,196,000 | Oct.– (1,180,000) |
| May– 1,841,000 | Nov.– (1,297,000) |
| June– 1,485,000 | Dec.– (2,001,000) |

1975

| | |
|---|---|
| 1st quarter ($4,500,000) | 3rd quarter ($ 9,977,000) |
| 2nd quarter ($6,965,000) | 4th quarter ($12,903,000) |

23. The Trustees of the LV commissioned an appraisal of the LV property in 1971. Two professional consulting firms, Ford, Bacon & Davis and Real Estate Research Corporation, have completed their respective studies of the operating improvements including equipment and the real estate holdings of the Debtor.

24. Each appraisal was conducted in accordance with accepted practices pertaining to the type of property to be appraised. All appraisals are as of June 30, 1971.

25. Appraised values of the operating improvements (e.g., buildings, gradings, tunnels, ties, stations, signals, etc.) excluding land values, are set out below:

| Road Property | Reproduction Cost New | Reproduction Cost Less Depreciation | Salvage |
|---|---|---|---|
| Improvements | $663,289,203 | $382,350,358 | $15,805,314 |
| Equipment | 82,536,510 | 50,392,310 | 11,233,230 |
| TOTAL | $745,825,713 | $432,742,668 | $27,038,544 |

26. Reproduction cost new was arrived at by applying prevailing costs of material and labor, or where necessary, historic costs were used to derive present costs in light of pertinent economic data and ICC indices. A similar method was used for locomotive and freight car evaluation.

27. Reproduction cost less depreciation was ascertained by reducing reproduction cost new to reflect the actual condition of the improvements as determined by inspections of the property with appropriate adjustments for obsolescence.

28. Salvage value was determined by application of the then current market price for used materials and equipment, and where reuse was not feasible, by estimation of the scrap value of the materials or equipment appraised. Appropriate reductions were made to reflect the present worth of items that would be disposed of over a significant period of time.

29. Since Ford, Bacon & Davis completed its appraisal of the road improvements and equipment, changes have occurred in the assets or their condition. Hurricane Agnes has intervened and a substantial amount of equipment has been retired. On the other hand, some new equipment has been acquired and scrap prices increased between June 30, 1971, the valuation date, and June of 1973. No attempt has been made to update the Ford, Bacon & Davis appraisal, or to estimate the general parameters of the changes in value that might be expected.

30. Real Estate Research Corporation's appraisal was based upon assumed fee simple ownership of a land inventory supplied by LV personnel. Two preliminary values were derived: fair market value for liquidation purposes—$57,375,-

7. Assumes no additional note increases in 1974.

000; and value for transportation purposes—$59,825,000. Both figures were then adjusted to reflect pertinent economic and market considerations.. The liquidation or salvage value of $57,375,000 was adjusted to a present worth of $37,100,000 because of the time required for sell-off. The in-use value of $59,825,000 was adjusted upward to $97,890,000 by various factors to reflect the extra value of the right-of-way in its "assembled" condition.

31. The appraisal by Real Estate Research Corporation is based upon market data of relevant sales rather than an analysis of the income-producing capacity of the property.

32. The aggregate appraised value of the property is reflected in the chart below. The reproduction cost new less depreciation and value of the property for transportation use are essentially the same concept: the present value of the property for railroad use. Similarly, salvage value and the fair market value for liquidation purposes are essentially the same concept: the highest value of the property for other than railroad use.

|  | Reproduction Cost | | |
|  | New | Less Depreciation | Salvage |
| Improvements | $663,389,203 | $382,350,358 | $15,805,314 |
| Land | 97,892,032 | 97,892,032 | 37,102,402 |
| Equipment | 82,536,510 | 50,392,310 | 11,233,230 |
| TOTAL | $843,717,745 | $530,634,700 | $64,140,946 |

33. Real Estate Research estimates that land values have appreciated from 7% to 10% between June 30, 1971 and June, 1973.

34. Before bankruptcy, LV deposited with certain indenture trustees $628,279.93 in proceeds from sales of real and personal property. As of January 1, 1974, interest thereon totaled $152,632. The principle and interest applied to each mortgage is as follows: LV Railway Terminal Company first mortgage—$527,732; LV Harbour Terminal Railway Co. first mortgage—$247,522; and applicable to certain loans guaranteed by the United States—$5,657. Draw-downs of $83,171 and $38,296 from the LV Terminal and LV Harbour Terminal interest accounts have been authorized. All funds now on deposit represent additions to the appraised value of the estate.

35. Since reorganization, sales of real and personal property have been consummated and the funds deposited pursuant to Orders Nos. 26 and 29. Sales through February of 1974 total $8,991,129. Total interest earned on the proceeds through February of 1974 was $689,097. Draw-downs of interest earned by these deposits have been authorized to the extent of $145,902. Only proceeds from sales consummated before the valuation date and the difference between the value ascribed to a parcel in the real estate valuation and the actual proceeds of the sale represent additions to the appraised value.

36. The primary bond issues of the LV and the appraised liquidation value of the property subject to the respective mortgage liens as of June 30, 1971 are reflected in the chart below:

| Bonds | Amt. Outstdg. | Appraised Liquidation Value of Property Subject to Mortgage Liens | | |
| --- | --- | --- | --- | --- |
| | | Improvements | Land | Total |
| LV Rail Way Co. First Mtg. 4½% Bonds due 7/1/74 | $ 9,189,000 | $ 4,772,111 | $ 4,570,000 | $ 9,342,111 |
| LV Harbour Terminal Railway Co. First Mtg. 5% Bond due 3/1/84 | 4,765,000 | 166,307 | 4,000,000 | 4,166,307 |
| Lehigh & Lake Erie RR Co. First Mtg. 4½% Bonds due 3/1/94 | 1,899,000 | 394,602 | 1,735,000 | 2,129,602 |
| LV Terminal Railway Co. First Mtg. 5% Bonds due 10/1/79 | 5,721,000 | 820,478 | 11,600,000 | 12,420,478 |
| LV RR Co. Gen. Consol. Mtg. Bonds due 5/1/2003 fixed interest series | | | | |
| A   4% | 4,925,000 | | | |
| B   4½% | 2,051,500 | | | |
| C   5% | 1,723,750 | | | |
| Contingent Interest Series | | 2,740,998 | 9,310,000 | 12,050,998 |
| D   4% | 10,475,000 | | | |
| E   4½% | 4,493,250 | | | |
| F   5% | 3,482,250 | | | |
| LV RR. Co. Consol. Mtg. 4½% bonds due 4/1/89 | 1,988,000 | 241,258 | 110,000 | 351,258 |
| | $50,712,750 | | | $40,460,754 |

37. In addition to the bond issues described in Finding 36, the following three issues are outstanding:

a. $4,982,000 in LV Railroad First Mortgage 4% Bonds due 6/1/76 and secured by property valued at $6,379,355 (improvements—$3,144,355; land—$3,235,000) are pledged as security for the LV's second government secured loan (see Finding 39) in the amount of $2,664,000, and the LV's 5th government secured loan in the amount of $2,165,000.

b. $24,400,000 and $1,000,000 in 5% and 4½% General Consolidated Mortgage Bonds secured by the same property securing Series A through F of the Consolidated Mortgage and pledged in the various amounts to secure the LV's five government secured loans.

c. $2,460,000 ($2,431,000 redeemed and $29,000 unredeemed) Pennsylvania & New York Canal & Railroad Co. Consolidated Mortgage 4½% Bonds secured by property valued at $4,353,000 ($3,048,300—improvements; $1,315,000 —land). Apparently the LV Trustees do not intend to recognize the $2,431,000 in redeemed bonds held by the Penn Central Trustees as entitled to treatment as secured debt.

38. LV's real property not subject to mortgage liens is valued at $1,704,307 (land—$1,227,402; improvements—$476,905).

39. The LV is the obligor on five loans which were guaranteed by the government before reorganization, and on which the government has honored its guarantee: First—serial collateral

notes—$2,800,000; second, 5% collateral trust notes—$2,664,000; third, 5% notes—$1,125,000; fourth, collateral trust notes—$2,531,000; fifth, 4¾% serial collateral trust notes—$2,165,000; totaling $11,285,000.

40. Certain equipment now being operated by the LV is subject to conditional sales or other security agreements aggregating $6,485,428.

41. To recapitulate, assuming the Penn Central Trustees holdings of the Pennsylvania & New York Canal bonds are appropriately considered as secured but excluding bonds held as collateral for government guaranteed loans, the outstanding bonds of the LV in the amount of $53,173,350 are secured by property valued at $44,824,050 as of June 30, 1971.

42. As of June 1973, more than 1,000 proofs of claim have been filed, asserting pre-reorganization claims (other than bond obligations) aggregating $10,976,461. Of this amount, claims aggregating $6,018,772 correspond with the Debtor's records and are presumably valid. The balance of $4,957,689 may be subject to challenge in whole or in part.

43. In addition, the Trustees of the Penn Central Transportation Company have filed a pre-bankruptcy claim of $24,064,988. ($882,021 of this amount may be in dispute). Most of the claim results from Penn Central's pre-reorganization practice of not pressing collection of the LV's monthly interline settlements due the Penn Central.

44. Excluding 63 shippers on lines which were subject to abandonment applications in June of 1973, 652 shippers throughout the three states served by the LV (accounting for 126,381 carloads in 1972, or 36% of 1972 carloadings), would be without railroad service if the LV were to cease operation. In addition, many shippers now served jointly by the LV and other carriers would be deprived of their option of shipping via LV. There is no evidence pertaining to the question of whether other carriers could or would increase service to these jointly served shippers or the extent, if any, of the additional costs that might be incurred by the jointly served shippers because of the rerouting of their shipments via other carriers.

45. Affidavits and letters submitted to this Court by over one hundred shippers indicate that these persons view potential cessation of LV's rail services as forboding economic disaster for them. Business activities of these shippers cover a wide spectrum of manufacturing and agricultural activities.

46. On the basis of an analysis undertaken in early 1973 by Wyer, Dick & Company, a transportation consulting firm engaged by the LV's indenture trustees, it appears that there are 14 separate segments of the LV which produce 34 or more car loadings per mile per year and which are so located in relation to connecting railroads as to make utilization of these segments by other carriers possible without substantial capital improvements. An officer of Wyer, Dick offered the opinion that these 14 segments should constitute attractive acquisitions by purchase or lease for the connecting carriers. However, virtually all of the prospective acquirers of these segments are themselves in reorganization under § 77. What effect, if any, passage of the Rail Reorganization Act of 1973 may have on the Wyer, Dick opinion is unknown.

47. If all 14 segments were to be acquired in one form or another by other carriers, only 63 shippers who shipped 3,408 carloads in 1972 would be left without service; or, stated another way, 97% of the carloadings would be served.

48. The 34 carloads per mile per year standard is derived from the ICC's 34-car rule under which a rebuttable presumption arises in an abandonment proceeding that the public convenience and necessity for continuation of the line is minimal or non-existent if fewer

than 34 carloads per mile per year are shipped over a particular section of track. This ICC criterion was premised on an analysis of the Commission's cases granting approval of abandonments. Pennsylvania v. ICC, 361 F. Supp. 208 (M.D.Pa.1972).

49. The 34-car rule as utilized by Wyer, Dick in its analysis is at best a guideline. Principles applicable to abandonment application procedures and business judgments concerning operation of part or parts of another carrier's line, do not necessarily coincide. Many factors would influence other carriers' decisions; e.g.: configuration of the carrier's existing service; availability of equipment; possible labor arrangements; character of the commodities moving over a segment; revenue and profit generation capacity of the segment; available resources of the carrier; and other profitable uses of the carrier's resources.

50. On the present record, the only portions of the LV that would clearly be attractive to other carriers are the L&S and LV lines that are used for bridge traffic between the Reading and D&H lines.

51. The Trustees have explored the possibility of the consolidation with the Reading, Central of New Jersey, Lehigh & Hudson, and Lehigh & New England Railroads. Whatever the intrinsic merit of this strategy, it is not an available alternative at the present time or in the foreseeable future.

ORDER NO. 245

And now, to wit, this 2 day of May, 1974, it is ordered, and this Court finds and concludes, that the Debtor, Lehigh

Valley Railroad Company, is not reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act (11 U.S.C. § 205), within the meaning of § 207(b) of the Regional Rail Reorganization Act of 1973.